This is Mincy and Amor. Mr. Waheed. It please the court. My name is Karam White on behalf of Mr. Mincy. Mr. Mincy had no knowledge of the conspiracy in this case. This case is very much like Dr. Abreu in U.S. v. Willner. He may have inadvertently forwarded a conspiracy, but he was just doing his own job. His job was that of a college recruiter. He was not a financial aid person. As a college recruiter, his job is essentially to recruit students, to have them come to the school, and they would fill out an application to apply for the school. That would then move its way through the system, and eventually, if they were accepted, they would go to financial aid later. Mr. Mincy was working to just satisfy his job requirements. Like Dr. Abreu, he made no additional money for his job. He only made $42,000 a year. He only worked at Fast Train for two years, 2010 to 2012. During that time, he made no additional money for more students coming in or less money for less students coming in. Like Dr. Abreu, he was the low man on the totem pole. Didn't some of the students testify that Mr. Mincy directed them to lie to other people at Fast Train about the fact that they had not graduated? The testimony from four students, Ian Screen, Rena Watkins, April Wingate, and Selena Wilson, were all very similar, which was that they said, I don't have a high school degree or a GED. And he said, well, Fast Train's the place to go then because we can help you with that. He believed that, according to Jose W. Gonzalez, who told him, who came from Miami up to Jacksonville to help do the recruiting and train the recruiters there, that you could go to a school called AWA, American Worldwide Academy, and you could simultaneously get your GED or high school credits while you're in Fast Train. He believed that, and that's what he told these students. Just to be clear, though, did these students testify that he told them to lie to other Fast Train employees? The students testified to check yes on the Fast Train admission form for either high school degree or GED. That was the testimony of those four students. And he told them to do that? According to those students. But the problem is, don't we have to, I mean, you know, don't we have to accept that as, in a light, most favorable to the verdict? But even if he did, that would not, that is not on the FAFSA. The taking money from government charge, 641, is. But it does show that he understood and was a part of the conspiracy here. I mean, doesn't it show that he knew that they were lying and he understood that the reason they had to do that was in order to get money from the government? Why else would you do that? Because he was told by Jose W. Gonzalez that his, he was a pastor. He was a person, according to testimony, by these students. In fact, April Wingate said he would go out on the street and help folks. And even her, who became homeless at one point, he fed her, he helped her find a place to live. He was a pastor in that community for 30 years. And his role was to help these students. When they said, we want to get educated, and he was told by Jose W. Gonzalez, here's a way that they can get into Fast Train, they can get an education, then he believed that and told them that, yes, you can do both simultaneously. I'm going to send you to Jose W. Gonzalez. And Jose W. Gonzalez testified to this, that students would come to him, he would charge them $475 and he would take half of it. And he said nothing about Mr. Mincy getting any of that money, knowing anything about what he was doing. He was essentially running a scam within the scam. Jose W. Gonzalez is the one who started this whole idea of saying to folks at the Jacksonville Fast Train office, we can do both simultaneously. And that's when they started saying that out on the street to students. Before that, they weren't saying it. They would put an ad out, people would call, and they would take the call as they come in for an admissions interview. There's one conversation, in fact, that's important here, which is Jose L. Gonzalez testifies. The government cites this as the mens rea for Mr. Mincy. It's actually the opposite. It clearly shows he did not have the mens rea to be part of a criminal conspiracy. Jose L. Gonzalez makes a controlled call to Mr. Mincy. And in that, he says that we had a recruiting technique called snatch and grab. Mr. Mincy responds, quote, I couldn't do that. It just didn't make sense because you have to pick and choose. Jose, in this case, Jose W. Gonzalez, don't pick and choose. Jose just snatch and grab. Mincy then adds towards the end that he was trained to pick and choose the students. In other words, picking qualified candidates. Jose W. Gonzalez admits to this when he testifies in the same trial. Courtney Douglas. You know what bothered me about that call? Mr. Mincy goes on to say, they say, aren't you concerned about we're getting people in without high school diplomas? And Mr. Mincy says, oh, no, we've got that covered. We have them sign on there who signs that they have not been persuaded by anyone or promised anything. He says, well, that's going to protect us. It's not on us. It's on the student. So they not only were recruiting them, telling them do this, they then had them sign something to say, don't you've represented that you weren't persuaded or told by anybody. And that's how your client says, don't worry about what we're doing because we've got the students admitting they weren't. I mean, that to me is good evidence of mens rea. What he is saying is that the actual form is that the student is the one who's making who's attesting to this on the application form. So what he is talking about with Hosea Adalva Gonzalez is that this isn't my technique. I'm not doing it, but this is what fast train is telling me to do. They've sent someone up. Let me quote. It's not on the school. This is your client. It's on the student. And the student is the one lying when the student states they had those credentials. Correct, because that is what he is responding to. To Hosea L. Gonzalez is that he is saying I am not the one who is making this decision to do it this way. Fast train is telling me this is how we're going to do it. And so this is the new way of doing it. So this is what I'm going to do. But what about what about Wingate's testimony that Mincy told her to, quote, keep it on the low, not to say anything? Unquote. When she told him she did not have a high school diploma. For Miss Wingate has actually testified that Hosea W. Gonzalez recruited her. She signed up prior to Mr. Meeting Mr. Mincy. But didn't she also say that about Mr. Mincy? What I just said? Keep it on the low. Don't. This is after she got in. So that statement in that context is now that you're in, don't do something to get messed this up. You need the education. But doesn't it show that he knew that there was a problem with with admitting students who didn't have diplomas and telling them to check off the box, whether it was April Wingate or not. He told other individuals to check off the box that they did have a diploma, not but not as part of a criminal conspiracy, doing it in order to help these kids get an education because he believed they could go through Hosea W. Gonzalez, which April Wingate did, by the way, and actually sign up for American Worldwide Academy and get this GED or high school credits. So he didn't have the mens rea to forward this criminal conspiracy. There's no 150 people testified. Not one person said he was in the room when the conversation about the conspiracy happened, that he talked about the conspiracy, that he knew about the conspiracy. Not one person. But what we know is that he. That's a rare case where the where the defendant talks about being in a conspiracy. Or even being in the room, though, when others are talking about it. There isn't even an implied conversation that he knows about the conspiracy. Some rebuttal time. Thank you. Mr. Kluge. Good morning. Please, the court. A number of issues. Some of the most important issues, I think, are the complete deprivation of all procedural statutory constitutional rights with regard to forfeiture. The underlying issues with regard to the correct calculation of loss, and particularly whether credit should be given to loss for students who actually were eligible after their first quarter or first semester. And secondarily, with regard to the conviction, the issue of, I think the government said there was no precedent in this circuit for this type of use of 641 to cover a false student loan application. That, again, I understand that the government likes to charge everything as theft. But there has to be some line between fraudulent loan applications and theft. And I think this case is the place to draw that line. And then third, and this one affects essentially all of the sentencing and forfeiture issues. This is a district court's decision restricting the application of the Lewis decision in the Supreme Court to state that even though in Lewis the court said that certainly you have a right to access untainted funds for your defense, even if the government has a theoretical claim or a claim that may become turned into a lien at some point. My reading of Lewis is until it becomes a lien, it's still untainted. It's still accessible to the defense. And for essentially, I think it's about 18 months in this case, the defendant did not have access to those funds during a period of time when his Sixth Amendment right still applied to the completion of his sentencing proceeding. Because forfeiture, again, is not like restitution. It's not something that stands apart from punishment. Forfeiture is a fundamental part of the punishment component of sentencing. And until a defendant has a right to counsel to go through all of these fundamental aspects of trial and sentencing in which he has a Sixth Amendment right to counsel in and of itself. And arguably he does not have a Sixth Amendment right to counsel as to appeal. Arguably that's a . . . He had appointed counsel at trial or retained counsel.  His original retained counsel . . . And he didn't ask for access to the funds until after conviction. Is that correct? Or was it after sentencing too, but before restitution and forfeiture? Help me with the timeline. He files both an oral . . . he makes an oral application and a formal application before . . . Sentencing is not completed until . . . There's a difference between sentencing here, the restitution part of sentencing, and the imprisonment part. It was after both conviction and the imprisonment part, before restitution, or when? The first formal motion is docket entry 480. The judgment . . . the original sentencing judgment comes in a couple of months later on a May hearing. This motion, I think, first formal motion was made in March. When was the sentencing hearing? The imprisonment's final . . . there were several sentencing hearings. There was more than one sentencing hearing. But the final one was May 2nd of 2016, and that is two months after the motion was filed. Yeah, but that was when they concluded on the restitution. No, restitution is a month later in June. When did the district court pronounce the 97 months, or whatever it is, Senate? May . . . I understand it. And there's a formal written application in March. The imprisonment sentence in the hearing is in May. The restitution hearing is in June. The final forfeiture order . . . the final forfeiture order is in July of the next year, but it . . . And am I correct, he didn't want the jury to decide the forfeiture? He wanted the district court . . . I mean, he's . . . They took that count out of the indictment when it went to the jury, or was it in the indictment? Yeah, it was a money judgment forfeiture, so I'm not really sure the exact extent to which the jury was . . . There was a right to a jury trial on it, but . . . But he said, however it came about, he said he would put it off and we'd do this later, before the court only. Is that correct? He did not demand a jury trial. Right. And he didn't want . . . determined everybody wanted more time at the time of the May imprisonment sentence. Everybody wanted more time to deal with forfeiture and restitution. Is that correct? Well, the government wanted more time, and it has never been a time where the defense did not invite any of the delay. What happened was the defense . . . Did the defense object to the delay? Yes, and . . . When was the first objection on the forfeiture issue? Well, again, it's . . . I'm trying to describe the objection was like this. The district court said something to the effect of, we're not going to go forward with forfeiture right now. We're going to wait until we finish with restitution, and the counsel says, I've never seen anything like that. Can you even go do this with restitution? And then there's a conversation about, well, the government just filed their motion for forfeiture. Do you want me to not give you time to respond to their forfeiture motion? So the defense is presented with . . . again, he's denied resources. He's presented with the option, either you're not going to have any opportunity to respond to the government's motion for forfeiture, or we're going to push it back, and they end up pushing it back for more than a year. Can you speak for a moment to prejudice? What is the prejudice to your client if we were to find that there was a violation? What is the prejudice? Have you shown that new counsel would have been hired, that new counsel would have done anything different? What is the prejudice? The prejudice was the absence of the specific prejudice on the record that was made by the counsel. Again, I understand the court's talking about the prejudice in violating all the procedural rights relating to forfeiture and not the Lewis violation. Right. There's immense prejudice from the Lewis violation, and there certainly were other counsel being sought to be brought in. This counsel, who had been retained under restricted funding and had been kept on the case now for 18 months after conviction to litigate, was clearly overwhelmed by it. There's plenty of prejudice on the Lewis violation. On this violation, the principal thing that was mentioned was we don't have our forensic accounting. And again, when you're talking about forfeiture, there's a number of things that go into forfeiture. At the very end of forfeiture, there's a concept that you need a hearing for. Where does it say that in the record? Where could I be directed to find where you all have established what the prejudice was below? At each of the motions, 480 and 515, and the docket mentioned that, as well as the discussion on the record of the applications. The government discusses it in its brief. The government says, well, we didn't have a forensic expert, but I refuted that in the reply brief on my discussion, showing that, in fact, we did. We just weren't able to use him because we didn't have the money. We, speaking, I didn't have any money. I wasn't even in the case at that point. I'm on the outside waiting for money to come in. I actually am part of the prejudice, but I don't think that's clearly of record. There was plenty of prejudice in this case. In some cases, you'd say, well, what's the prejudice? You had the sentencing. You had the forfeiture hearing 14 days later. We're talking about a forfeiture hearing, forfeiture process. We don't have a forfeiture hearing at all, and the forfeiture process occurs 14 months later. We have a tremendous amount of work that has to be done, tremendous amount of work and no money to pay for it. For 14 months, it gets litigated. It gets thrown over to the magistrate judge, and the magistrate judge finally goes through all kinds of processes on it with regard to litigating mostly this issue of restraint of funds. We litigate the restraint of funds. There's other documents. 594 addresses this issue also. This is a heavily litigated issue. The prejudice is clear on that issue. But I don't think the court needs prejudice where you have the precedent of this court in the Petrie case and the Shakur case we cited in the Eighth Circuit, but you simply can't handle forfeiture this way. Restitution is different. Dolan explains you can go beyond the limit in restitution because it's really not part of the criminal punishment in and of itself. It's a restitutionary remedy that's thrown into the criminal process. Forfeiture is part of punishment. It is just as much a punishment as the prison. If you're taking, in this case, $2 million from a guy, it means just as much as arguing about one month in prison, even to him. Thank you very much. I recognize my time. I still have one question on the forfeiture. Did he have his retained counsel all the way through the forfeiture? Yes, he never did. The retained counsel never went through. Did the counsel ever make a motion under Aiki or whatever for an expert witness or a forensic accountant to be appointed by the court saying, if you're not going to give us the money, we want to get a court-appointed expert? I'm not saying they had to. I'm just curious, did they? That issue was never raised. Okay, so they didn't ask the court to do an expert or anything. And that was addressed in Louise also.  I'm not saying the outcome. I'm just trying to understand if there was ever such a motion. It was not. Thank you. Mr. Wu. Thank you, Your Honor. Jason Wu on behalf of the United States. One imagines that Mr. Amor named his school Fast Train to convey the idea that it would take students where they wanted to go in life. But it might have been more aptly named the Gravy Train, as Mr. Amor and his co-conspirators used the school to defraud the government of millions in student aid funds. This court should affirm their convictions, sentences, and Mr. Amor's forfeiture for those offenses. I'll just go in the order of the arguments as I heard them. So let's start with Mr. Mincy's sufficiency challenge. I think, Judge Rosenbaum, you have it exactly right. We have to take the witnesses as credible, draw credibility inferences in favor of the verdict. And so that means we accept as true the student testimony that Mr. Mincy coached students to lie about their eligibility, specifically their status as high school graduates. And I think there are two. He says that just the fact that he coached them to lie about their eligibility doesn't necessarily mean he was aware of the conspiracy because he was just trying to, yeah, he told them to lie, but he was just trying to get them an education. And he could have done that separate and apart from any kind of conspiracy. That's what he's arguing. Did you want to respond to that? I mean, I don't know. You might want to talk about what Judge Hull was mentioning. Yes, precisely. So I was about to say there are three interrelated categories of evidence that confirm both what he did and that he had the mens rea, the culpable mens rea, while doing it. So the first category is the student testimony that you mentioned. The second piece of evidence is, as Judge Hull mentioned, Government's Exhibit 87, which is the recorded call transcript on which Mr. Mincy confirms that he knows this is wrongful. The key of that language that Judge Hull has already quoted is that he knows it's wrong for the students, it's illegal for the students to lie about their eligibility. He knows what the consequences are of the lying. Precisely. Exactly. In that conversation, he's even talking about an attempt to evade and conceal the conspiracy by having them paper the record with this disclaimer form. So right there you have knowledge of wrongfulness combined with the acts which are the wrongful acts. The third and final category of evidence on this front is that Mr. Mincy's co-conspirators testified that they trained him. And so Mr. Areola, who was the head of admissions for this university during the relevant time frame, testified at docket entry 497, pages 47 to 48, that the Jacksonville contingent, including Mr. Mincy, came down to be trained by him. And then Jose Gonzalez, his other co-conspirator, testified at docket entry 500, pages 112 to 113, that he went out on the streets and recruited with Mr. Mincy, and he said something to the effect of, I saw him coaching them and stuff. So again, we take all that testimony as credible and draw inferences in favor of the verdict. Those three categories of evidence confirm that Mr. Mincy knew about the conspiracy, he knew about the wrongfulness of the acts that his co-conspirators were asking him to accomplish, and that he actually carried out those acts nonetheless with the students who have already been mentioned today at argument. Turning to Mr. Moore's points, I think he touched briefly on a few, so I'll touch briefly on a few, and then we can focus on what Your Honor spent most of the time questioning him on. So regarding sufficiency, again, he reiterates this claim that we should not have charged this as a 641. I think that's answered, there are a few ways to answer that. The first is simply to look at the text of the statute. This crime fits within the text of the statute, within the list of elements that we cited in our brief, so the fact that it could be charged under another statute is immaterial. There are many overlapping statutes in the criminal law, and we have the discretion to charge which one we want. He also said that there's no precedent establishing that 641 covers student aid funds. I think that's not accurate. The Evans case that we cited in our brief is a pre-split Fifth Circuit case, and so that would be binding precedent on the issue. And then the Whaling decision we cited is post-split 1982, but it deals with a similar student loan Title IV funds fraud that's also, I believe, charged under 641. And in any event, there are similar cases where government loans, the theft of government loans, or obtaining of government loans is charged under 641. As for the loss calculation, as I understand it, the only point he raised today was whether there should have been an offset for the six-credit-hour rule. And I believe it's worth talking about that a little bit to understand both what the evidence was at trial and why it doesn't apply, why that shouldn't be an offset to his loss. Maybe it's best to begin with an analogy, because I think this is the argument he's trying to make. Imagine that I defrauded a charity. I said I need $10,000, I have a rare illness, and in fact I don't have the illness. I take the money, I go to Las Vegas, I blow $5,000 of it at the craps table, and then when I get home about a month later, I find out, lo and behold, I actually have contracted that illness. So now the lie that I told to get all the money turns out to be true after the fact. That's similar to what he's saying. These students applied for federal Title IV funds. They lied to get all the money, because on the actual application, the FAFSA, they said, I am a high school graduate. Now, when they go to this school and arguably complete or don't complete certain coursework, there was disputed testimony about that, eventually they get enough credit hours from Fast Train that in theory they could have separately applied to either Fast Train or a different school and claimed this six-hour ability-to-benefit criteria. But of course that's not what they ever did. That's not what their application said. So there shouldn't be an offset for a fraud where the lie you tell happens for independent reasons to come true at a later point. And I think that's the overarching reason why this argument lacks merit. I was confused in reading the transcript as to whether or not the district court actually did a deduction from the $4-whatever-million down to $1.9 for some of this. Are you saying there was no deduction for the six-hour credit students? Correct. There was no deduction. Okay, because there was a deduction for some other things. Exactly. The single biggest deduction was related to students who were either still paying or in forbearance, and so the district court thought it was inappropriate to yet count them as lost. Who knows whether they'll end up being lost, but that's a separate issue. The other thing I want to bring up about the six-credit-hour rule is, in reality, the six-credit-hour rule was never used by Fast Train in any way, and multiple witnesses confirmed this. Mr. Areola, again, was asked at docket entry 498, pages 27 to 28, whether, at least on paper, what was Fast Train's policy about who was permitted to enroll. He answered, pretty much they have to have a high school diploma or a GED. The follow-up questions, does it say credit hours on there? Not at all. Does it say clock hours on there? Not at all. Is there any mention of ability to benefit on there? I have never seen that at Fast Train. No. So the reality is Fast Train never relied on this grounds of eligibility, and so it should not serve as an offset for Mr. Amor at loss. Turning to the final issues which are related, the restraint of assets and forfeiture, I think Judge Rosenbaum, you got it right insofar as you asked, what's the prejudice from this? And also this is related to Judge Hall's question about timing, because I don't think they sufficiently showed any prejudice below. Here's the timing, and I think this is why it also goes into this issue of prejudice. There were three sentencing hearings. This was split up. There's a first sentencing hearing in March, April, May. The first time Mr. Amor ever asked for his funds to be released is orally at the second of the three sentencing hearings in April. He follows that up with a written motion. In that written motion, he does ask for funds to engage professionals to assist him in contesting the loss amount. On that front, the court, first of all, denied it as untimely because it happened in the midst of sentencing, and it's an issue that he should have been aware of on the front end. So that's already an independent basis to affirm. But moreover, there was no prejudice because the loss calculation was not a detailed forensic accounting type calculation. It required no knowledge of gap principles, no knowledge of tax law, nothing that you would expect you'd need an accountant for. In fact, Mr. Amor's own counsel said at some point during the sentencing that he wished he had some magic skill or science to apply to this determination. That's at docket entry 532, page 5. But he did not, and he said, I just had to do some analysis. I just looked at the list, and I see these blanks. And that's really what it was. It was a methodical task, laborious task, but it was not a task that required expert assistance. And so there's no prejudice, at least in the sentencing phase of this, from the denial of his request. The important thing to realize in the timeline is that he did not then renew a request for an accounting expert prior to the restitution and the forfeiture. So there is a second request, which Mr. Amor alluded to, that comes shortly after sentencing. However, if you look at that one, I believe it's docket entry 512, it specifically requests that the money be released to pay for pending legal fees, in other words, for his trial counsel's bills, and for the assistance of appellate counsel. So he abandons the notion that he needs an accounting expert and never asks again for an accounting expert, either to be paid out of restrained funds or, as Judge Hall alluded to, out of court funds. And so we believe he hasn't specifically shown any prejudice to his forfeiture because he didn't make that request. The final issue I'll discuss briefly is the timing issue. I attempted to lay this out in the supplemental authority, so I'm happy to elaborate on it if this court desires, but my understanding of the line in the case law is this. If the defendant knows about forfeiture before at sentencing, he's notified that forfeiture is coming, then there's no prejudice to him. There's no violation of Rule 32 if the proceedings continue after the point of sentencing. That's the Canoe case that we cited and the Chair of Chairs case. I mean, there has to be probably some logical point where you can't hold it over a defendant's head anymore. Sure. Well, of course, Rule 32.2 gives us this rough guideline, which is that the forfeiture should happen as soon as practical, or at another point in the rule it says, unless doing so is impractical, it should happen, the preliminary order should happen before sentencing. So there's definitely this guideline of practicality. In this case, the amount of time it took was as soon as practical. Precisely, and the reason is that this is a complex... There was not a preliminary forfeiture order entered in this case. There was a line in the judgment which we would consider a general order of forfeiture. I mean, before sentencing, there was not a preliminary order, as I understand it. That's correct, and the reason... Hopefully, after the verdict is in and guilt is found, a preliminary order of forfeiture will be entered, and then you go forward. I understand, Your Honor, and in simpler cases, that's... That's the way it's supposed to be. Certainly, and I think the rule contemplates in the mine run case that's the way it should be, yes. So to give an example, in a gun prosecution, 922G, commonly the felon has to forfeit the firearm involved. That's a very easy case, right? You get your verdict. He's guilty. Preliminary forfeiture order. The gun is ours. However, in this case, there were difficult issues surrounding loss amount, so it was not practical to enter a preliminary forfeiture order when you did not even know the amount of the money judgment, did not know how much property would need to be seized, and that's why the rules, 32.2, I believe it's B... Let me look at the rule not to get this wrong. I'm no forfeiture expert. B2C states that you can enter a general order of forfeiture when the court cannot calculate the total amount of the money judgment prior to sentencing, and so that's exactly what we had here. Mr. Amor saw forfeiture coming the whole way. It was discussed pretrial. There was an agreed restraint of assets pretrial. Well, it was in the indictment, for heaven's sake. It was in the indictment precisely, Your Honor. It was discussed in a joint status report where the parties reported that they were trying to come to an agreement on forfeiture just three and a half weeks after the trial, and so he saw this coming the whole way. At sentencing, the court notified him that it would enter a forfeiture order once it determined the appropriate amount, and that's exactly what it did in the post-sentencing proceedings. Was there a general order of forfeiture at any time? Your Honor, we identified the general order of forfeiture. So the common practice in our district is what's contained in the judgment at docket entry 489, page 7. It states, the defendant shall forfeit the defendant's interest in the following property to the United States, deferred until restitution hearing, and that's the standard practice of the courts in our district is to input such a general order stating that forfeiture is coming when it's not able to determine the precise amount of the money judgment. If Your Honors have no further questions, we respectfully request. How long did the government and the defendant work together to try to come up with a settlement or agreed upon forfeiture, if you know? Of course, it's not exactly clear in the record, but in docket entry 431, which is the joint status report, that's December 18, 2015, we state, both parties, that we're working toward coming to an agreement. Eventually, the government files its own preliminary motion for forfeiture in March 2016. So I assume at some point in that four-month span, the negotiations broke down, and the government realized it was going to be a contested matter. And he says 18 months, so when is the 18 months calculated from, as you understand it? I think he may be saying from, it's possible he may be saying from the verdict, which was November 2015, to the final orders, which were entered in May 2017. Okay. So it is true that it happened. That's when the sentence, when the case was over then. Correct. And during a part of this, it was referred to the magistrate judge, who subsequently determined he did not have jurisdiction, is that right? That's right. How long did that take? So that took a few months, so I'm afraid I don't have the exact dates. But I would also like to stress that the reason the magistrate judge did not have jurisdiction  or at least informed Magistrate Judge Goodman of that withdrawal of consent, at the forfeiture hearing. So in other words, it had been fully briefed, they show up to court, and then toward the end of the hearing, Mr. Amore said, by the way, I refuse to consent to this, therefore I believe you have . . . Had he signed a written consent before, or his counsel, for it to go to the magistrate judge, or did the district court just refer it? I believe the district court just referred it. So when eventually he showed up in front of the magistrate judge, he withdrew his consent. But of course that did waste a few months, you could say, with the referral, the unnecessary referral. Did you brief it before the magistrate judge? After Mr. Amore withdrew his consent, Magistrate Judge Goodman asked the parties to brief the issue of his own jurisdiction, and they did so after that hearing. So in theory, if that had been raised before the hearing, this might have taken a little less time. So the hearing that ultimately resulted in the forfeiture couldn't have occurred during that period. Is that fair to say? That's right. And I should add on the hearing front, Judge Leonard, when she ultimately entered her preliminary order of forfeiture, noted her belief that the parties had never requested an evidentiary hearing. So although they briefed legal issues extensively, there are many pleadings in the record, at no point did Mr. Amore say, I want an evidentiary hearing in front of the judge on a specific fact issue. These were all legal arguments, some of which we've discussed today and some of which are covered in the papers. If there are no further questions, we respectfully request that this court affirm the conviction, sentences, and forfeiture. Thank you. There's really no evidence of Mr. Areola properly recollecting Mr. Mincy coming to Miami for any sort of training. It was contradicted by all the other witnesses who were in that training. But the important piece here is that if indeed there is a conspiracy at all that Mr. Mincy is involved in, it is that of him and the students to get those students into the fast train, not of him and the fast train staff to defraud the federal government. He is asking the students to state that they have a GED or a high school degree in the application for fast train, not on the FAFSAs. He is not even in the room when any of the financial documents are being done. Counsel, he understands what the consequences of lying on the application is. The application for fast train. I understand that, but ultimately the government is going to provide some money. Whether he's recruiting somebody who can pay for it on their own or is going to apply for student care, he doesn't know that. Ultimately the government is going to be defrauded. Not necessarily. If someone is coming and paying their own way, the government has nothing to do with that. He is in the recruiting of students into. I understand what he was doing. My point being that he is. My question is, what could he foresee as the consequences down the road of what he was doing in conjunction with the other parties involved? Since his role is to recruit the students in, he's foreseeing that they're going to get into school. He sees that people are going to school every day. It's a real school. People are getting educated in a community that's a very financially underprivileged community. That's how he sees it. All right. Thank you. There was no general order of forfeiture. There was no consent to the magistrate. A request for counsel is never untimely. Sentencing has not occurred. Why would that be untimely? How could it possibly be untimely to want counsel? What do you say about the statement they say in the judgment in the JNC that there's general order of forfeiture and the amount to be determined? What do you say about that? There is no such thing. It says the issue of forfeiture will be taken up at a later date, which is exactly what the judge said at sentencing. General order of forfeiture is a very specific thing. The district court has to make it very specific. What you're saying is what's in the judgment is not sufficient? It is neither sufficient nor was it ever intended to be a general order of forfeiture. That's a very, very specific thing. It's not something you just throw around and say, oh, this is a general order of forfeiture. It has very specific requirements under Rule 32.2. None of the requirements of Rule 32 were complied with. To have a defendant purportedly sentenced but not sentenced for 18 months is a complete violation of Rule 32. To have a defendant never have a forfeiture hearing is a complete violation. There is no need to go to prejudice once you've denied the forfeiture hearing, period. This claim of, well, he didn't want a forfeiture hearing in front of the magistrate judge that he had withdrawn his consent to be in front of, it's irrelevant. How would the magistrate judge have jurisdiction to conduct a forfeiture hearing? You didn't. That's positive. That's part of the indictment. Yes, it is part of the indictment. The issue here was – The magistrate judge could hear a bunch of testimony and do nothing else. Right. This was a substitute asset forfeiture. Okay. Sorry. It's not just determining loss. It's not just denial of the account. I understand that. So we had all kinds of arguments to make, all kinds of presentations to make. To deny us a hearing, there's no exception for that. Your client, during that 18-month period, asked for an evidentiary hearing in writing? Yes, he did. Okay. When did that occur? It occurred when the magistrate judge asked, are you demanding an evidentiary hearing? We specifically demanded an evidentiary hearing. And then what happened after that? Then we – It was through the consent to the magistrate judge. There was never consent to the magistrate judge. These terms are being thrown around as if they were true. There was no consent to the magistrate judge. Okay. There was an incredible amount of delay, and then there was more delay because it went to the magistrate judge. When the district court refers it to the magistrate judge – We object eventually. How long does it take you to object to the referral? Or do you know? I don't know whether – It wasn't immediate. There was a status conference and then – What was the referral for? It was – My position is the magistrate judge lacked jurisdiction to make a forfeiture determination because that is part of the indictment and part of the proof beyond a reasonable doubt. I agree that he had no jurisdiction, Your Honor, because it is part of – So what was the reference? What did the judge say that the magistrate was supposed to be doing? She just referred forfeiture to the magistrate. Oh, my. And then he doesn't conduct a hearing because we contest his jurisdiction correctly, and then we're being punished for correctly contesting his jurisdiction. In writing, we say we want an evidentiary hearing. We didn't get any hearing at all and were denied counsel. This is well beyond Petrie. I want to just make one brief reference. The government says that Evans and Whaling resolved this issue. First of all, the issue was not in any way raised in Evans. The funds can be government funds. The issue was not whether the government is paying the money. The issue is whether when does a loan fraud become a theft fraud. In Whaling, it was because there were specific funds that were converted at the time and used for a different purpose than were authorized to be used for. We understand your point and your time. Thank you. Sure. We'll be in recess.